UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSCOE WEST,

                Petitioner,

v.                              CASE NO. 2:08-CV-12574
                              HONORABLE DENISE PAGE HOOD

LLOYD RAPELEJE,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

      Petitioner Roscoe West has filed a *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254.  The habeas petition challenges Petitioner's state conviction for first- degree criminal sexual conduct, for which he was sentenced to 25 to 75 years in prison as a third habitual offender.  Because the Court finds no merit in Petitioner's claims, his habeas petition is **DENIED**.

**I.**    **Background**

      **A.  The Facts**

      Petitioner was charged in Oakland County, Michigan with four counts of criminal sexual conduct in the first-degree.  The charges arose from allegations that Petitioner sexually assaulted a nineteen-year-old mentally retarded woman at approximately 2:00 a.m. on February 2, 2004.  At Petitioner's joint trial with co-defendant Victor Page, the complainant testified that, while she had never met West prior to that date, she met Page at a mall, where they exchanged telephone numbers.  She had spoken to Page on the

phone a few times before the night of the incident, when he invited her to dine with him at a Coney Island. The complainant lived with her parents, but left home after 11:00 p.m. without her parents' approval. Page, accompanied by his brother Pierre Wallace and friend Robert Wilson, picked the complainant up from her home. After dinner, Page took her to Wilson's apartment in Pontiac, Michigan although the complainant expressed a desire to return home.

Once inside the apartment, Wallace allegedly persuaded the complainant to follow him into the basement by telling her that he had something to show her there. Petitioner was seated on a couch in the basement. He and Page removed the complainant's clothing against her will, Page and Wallace held the complainant down as Petitioner inserted his penis into the complainant's vagina and anus. Petitioner then held the complainant down as Page penetrated her vagina with his penis. Petitioner subsequently penetrated the complainant's vagina a second time. He mentioned taking her to Chicago. Wallace told her that he had a gun, and he threatened to kill her if she told anyone about the incident.

The men then left, and the complainant went upstairs, where she used the telephone to arrange for someone to pick her up. She stayed on the phone until Desiree Lopez arrived. She ran barefoot to Lopez' car and was visibly upset on the ride to her sister's home. She asked Lopez to leave quickly because she thought that the men would return. Later, the complainant was taken to the hospital where a physician noted that she had been bleeding, had incurred an abrasion on her head, and was anxious. The complainant informed the physician that two men had penetrated her anally and vaginally and that four to five individuals had held her down.

The complainant informed registered nurse Margaret Lane that she had been held

2

down by two men while being anally and vaginally assaulted by two other men.  She also stated that her ex-boyfriend had taken her to the apartment where the assault took place, but that he had not taken part in the assault.  The complainant suffered from an abrasion on her head, redness and tenderness in her inner labia majora, collarbone, and left knee, a two-by-two centimeter bruise on her right hand, bruising on her thorax and hip, tears in her anal opening, and an abrasion on her cervix. She was still bleeding from her hymen during an the evaluation by Lane at 8:00 a.m.  Lane testified at trial that the complainant's injuries were consistent with her claim of rape.

Medical personnel contacted the police. Two days after telling her story to the police, the complainant admitted to the police that she had lied about her ex-boyfriend's involvement in the incident.  She  testified at trial that she had lied out of fear that the men who had raped her would kill her if she told the truth and identified them.

The complainant identified Page by name when interviewed by the police, and she immediately picked Petitioner out of a lineup of eighteen photographs. Samples of blood taken from her cervix, external genitalia, and underwear matched Petitioner's DNA.

Petitioner did not testify at trial, but in a pretrial statement to the police, he admitted to having vaginal sex with the complainant on the night in question while Page was present. He also admitted to seeing blood on the couch in the basement.  He informed the police that the sexual activity was consensual.

Robert Wilson testified for the prosecution.  He stated that, after Wallace, Page, Petitioner, and the complainant arrived at his apartment, Petitioner and the complainant descended to the basement.  He did not hear any noise or screams coming from the basement.  Later, Petitioner, Page, and Wallace left his apartment, and the complainant

3

used an upstairs bathroom. She subsequently approached Wilson and started crying. She explained to him that the men in the basement had tried to have sex with her. He helped her make a telephone call and told her that the men would be right back.

Wallace testified for the defense that he and Petitioner went to Wilson's apartment to pick up Page, who was on the couch with the complainant when they arrived. At this point, the complainant stopped talking to Page and started flirting with Petitioner. The complainant then led Petitioner to the basement. Wallace claimed that he did not hear any screaming or commotion in the basement, and he denied touching or threatening the complainant himself.

A Pontiac school psychologist testified that in 2000, the complainant was evaluated as "functioning in the lower realm of the mildly impaired, mildly developmentally disabled, mildly to moderately impaired range of retardation." (Tr. Jan. 20, 2006, at 83.) The complainant's overall IQ score was 56, whereas the average individual's IQ score falls between 90 and 109. According to the psychologist, IQ scores typically remain the same over time. Thus, although the complainant was twenty-one years of age at the time of the trial, she had the mental capacity of a nine-year-old child. Her language and verbal skills were depressed, and she experienced confusion and difficulty comprehending questions.

### B. The Verdict, Sentence, and Appeal

On January 27, 2006, an Oakland County Circuit Court jury found Petitioner guilty of one count of first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b(1). The jurors acquitted Petitioner of two additional counts of first-degree criminal sexual conduct, and they were unable to reach a decision on a fourth count of first-degree criminal sexual conduct. The trial court sentenced Petitioner as a habitual offender, third offense, Mich.

Comp. Laws § 769.11, to 25 to75 years' incarceration.  The Michigan Court of Appeals affirmed Petitioner's conviction, *see People v. West*, No. 2699294, 2007 WL 1491075 (Mich. Ct. App. May 22, 2007) (unpublished), and on September 24, 2007, the Michigan Supreme Court denied leave to appeal.  *People v. West*, 480 Mich. 893; 738 N.W.2d 748 (2007).

### C.  The Habeas Petition and Answer

Petitioner filed his habeas corpus petition on June 17, 2008, raising the following four claims:

I.    Petitioner was deprived of his Fifth and Fourteenth Amendment right of due process and his Sixth Amendment right to a fair trial and the effective assistance of counsel when the prosecutor was permitted, without objection, to lead the most crucial witness.

II.   Petitioner was deprived of his Fifth and Fourteenth Amendment right of due process and his Fifth Amendment right of confrontation and a fair trial by the intransigence of the complaining witness.

III.  Petitioner was deprived of his Fifth and Fourteenth Amendment right of due process by prosecutorial vouching.

IV.   Petitioner was deprived of his Fifth and Fourteenth Amendment right of due process when his counsel was precluded from interrogating Detective Cerna about Pierre Wallace.

Because Petitioner did not file a supporting brief, the Court has looked to his state appellate brief for a fuller understanding of his claims.  Respondent argues in an answer to the habeas petition that Petitioner's first claim is not cognizable on habeas review, that his second and fourth claims lack merit, and that his third claim is procedurally defaulted.

5

## II.  Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state

court's adjudication of his claims on the merits

> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.  Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  "[A]n

*unreasonable* application of federal law is different from an *incorrect* or *erroneous*

application of federal law."  *Id.* at 412 (emphasis in original).  A federal habeas court may

issue the writ only if the state court's application of clearly established federal law is

unreasonable.  *Id.* at 411.

## III.  Analysis

### A.  The Prosecutor's Use of Leading Questions

Petitioner claims that he was deprived of due process and a fair trial by the

prosecutor's leading questions during direct examination of the complainant.[1]  Petitioner

---

[1]  As examples, Petitioner points to the following questions, which the prosecutor posed to the complainant:

claims that it was impossible to distinguish between prosecutorial claims and actual testimony at trial and that the leading questions were particularly inappropriate because the complainant had a low IQ and therefore was vulnerable to suggestion.  Petitioner further alleges that he was denied effective assistance of counsel by his attorney's failure to object to the leading questions.

The Michigan Court of Appeals ruled that the trial court did not abuse its discretion in permitting the prosecutor to use leading questions during the examination of the complainant and that the result of the proceeding would not have been different had Petitioner's attorney objected.  Although the Court of Appeals expressed reservations about the extent to which the prosecutor used leading questions, it agreed with the trial court's ruling that, "[g]iven the mental capacity of the [complainant] and the events that happened to her, leading questions were necessary to develop her testimony."  *West*, 2007 WL 1491075, at *2.

---

"[D]id somebody take your clothes off?"  (Tr. Jan. 23, 2006, at 61.)
"So, Roscoe West and Victor Page are in the basement and you say they start taking your clothes off?" (*Id.* at 63.)

"Did you tell them to stop?"  (*Id.*)

"Are you screaming?"  (*Id.* at 65.)

"Does Roscoe West put anything in your butt?"  (*Id.*)

"[T]his is as Victor Page and Pierre are holding you down?"  (*Id.*)

"Okay.  Once he takes his penis out of your butt, does Roscoe West then put his penis in your vagina?"  (*Id.* at 67.)

"When Victor gets off of you, does Roscoe West get on top of you again?" (*Id.* at 69.)

7

### 1. Permissible Use of Leading Questions

Under Michigan Rule of Evidence 611(d)(1), a party may ask leading questions on direct examination of a witness as necessary to develop the witness's testimony. Posing leading questions on direct examination of a mentally retarded rape victim is permissible where the complainant functions at a very basic level and the questions are necessary to develop the testimony. *Jordan v. Hurley*, 397 F.3d 360, 363 (6th Cir. 2005); *United States v. Goodlow*, 105 F.3d 1203, 1207-08 (8th Cir. 1997).

The adult complainant in this case had the mental capacity of a nine-year-old. Her mental retardation justified the use of leading questions.

Even if the prosecutor erred in asking an excessive number of leading questions, the questions did not result in the admission of inadmissible evidence. Furthermore, the complainant provided incriminating testimony when she was not asked leading questions. She insisted on cross-examination by the defense attorneys that Petitioner and Victor Page had raped her. Therefore, the prosecutor's leading questions did not deprive Petitioner of due process or a fair trial.

### 2. Defense Counsel's Failure to Object

The Court also rejects Petitioner's claim that his trial attorney was ineffective for failing to object to the prosecutor's leading questions. The Supreme Court's ruling in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), "qualifies as 'clearly established Federal law'" for purposes of reviewing a petitioner's ineffective assistance of counsel claim. *Williams*, 529 U.S. at 391. Under the *Strickland* standard, a petitioner must demonstrate that his counsel performed in a deficient manner and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

8

Under the deficiency prong of the *Strickland* standard, counsel's performance is deemed deficient if it "fell below an objective standard of reasonableness" and if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687-88.

In order to establish prejudice, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner proves both elements of the *Strickland* standard, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Under *Jordan* and *Goodlow*, the trial court did not err in allowing leading questions. Consequently, defense counsel's performance did not fall below an objective standard of reasonableness. It is also unlikely that the outcome of the trial would have been different had Petitioner's attorney objected, because the trial court allowed leading questions when the co-defendant's attorney objected to a leading question. (Tr. Jan. 23, 2006, at 97). And, on the fifth day of trial, the trial court granted the prosecutor's request for permission to use leading questions. (Tr. Jan. 25, 2006, at 136.) Finally, in its charge to the jury, the trial court informed the jury that the lawyers' questions were not evidence and that the questions served only to illuminate the witnesses' answers. (Tr. Jan. 26, 2006, at 98). For all these reasons, defense counsel's failure to object to the prosecutor's leading questions did not amount to deficient performance and did not prejudice Petitioner's defense.

### B. The Complainant's Memory Lapses and Intransigence

Petitioner asserts that his rights to due process, to a fair trial, and to confront the witnesses against him, were violated by the complainant's intransigence. The complainant refused to answer many questions posed to her by the defense attorneys, and she claimed to have memory lapses throughout the attorneys' cross-examination of her.[2] Petitioner contends that the complainant selectively chose the questions she wished to answer and that her refusal to answer some questions foreclosed him from impeaching her and from presenting exculpatory evidence. The Michigan Court of Appeals determined on review of this claim that Petitioner was not denied his right of confrontation.

The Confrontation Clause of the Sixth Amendment "guarantees to a criminal defendant the right 'to be confronted with the witnesses against him.'" *Danner v. Motley*, 448 F.3d 372, 377 (6th Cir. 2006). The Clause, however, "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (*per curiam*) (emphasis in original).

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation

---

[2]  Petitioner cites to the following responses as examples of some of the many nonresponsive or evasive answers given by the complainant on cross-examination by defense counsel:

"Do I gotta answer that? . . .  No comment."  (Tr. Jan. 23, 2006, at 114.)

"I already answered it."  (*Id.* at 129.)

"You could ask me all day the same question and I'm not going to answer it."  (*Id.* at 134.)

"I said I already answered it."  (*Id.* at 171.)

10

Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

*Id.* at 21-22. "The weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee." *United States v. Owens*, 484 U.S. 554, 560, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988).

The complainant in this case was not only mentally retarded, but somewhat hearing impaired as well. Even though she refused to answer some questions posed by defense counsel and claimed to be unable to remember certain details about the incident, defense counsel did have an opportunity to challenge her version of the incident on cross-examination. Petitioner's attorney also used the complainant's intransigence to argue that she had manipulated the jury and was not a credible witness. (Tr. Jan. 26, 2006, at 114-15, 117, 123-26.) The trial court, moreover, directed the jury to evaluate the credibility of witnesses in relation to whether they seemed to have a good memory, whether they seemed to be argumentative, and whether they appeared to be evading questions. (*Id.* at 137.) The Court therefore finds that Petitioner was not deprived of his right to due process and a fair trial or his right to confront the witnesses against him by the complainant's intransigence and memory lapses.

### C. Prosecutorial Misconduct through Vouching

Petitioner alleges next that the prosecutor deprived him of his constitutional right to due process of law by vouching for witnesses. Petitioner has not pointed to any specific incidents of vouching, but in his state appellate court brief, he objected to the prosecutor's

comment about Robert Wilson during closing arguments. The prosecutor stated in regards to Wilson's testimony, "That guy's telling [the] truth, then [the complainant] knew they were coming back. I have no doubt he said that they're coming right back." (*Id.* at 128.)

### 1. Procedural Default Analysis

The Michigan Court of Appeals reviewed Petitioner's prosecutorial-misconduct claim for "plain error" because he did not object to the prosecutor's remarks during trial. Respondent therefore argues that Petitioner's prosecutorial-misconduct claim is procedurally defaulted by his failure to make a contemporaneous objection. The Court agrees. Because Petitioner "failed to object at trial to the prosecutor's statements, []his claim is procedurally defaulted unless [he] can show 'cause and prejudice' to excuse the default." *Davis v. Booker*, __ F.3d __, __, No. 09-1140, 2009 WL 4795326, at *6 (6th Cir. Dec. 15, 2009) (citing *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)).

Petitioner has not advanced any argument in support of a finding of "cause and prejudice" for his failure to object to the prosecutor's argument at trial. The Court therefore deems the "cause and prejudice" argument abandoned. *Roberts v. Carter*, 337 F.3d 609, 613 (6th Cir. 2003).

Petitioner does contend that the prosecutor's vouching resulted in a miscarriage of justice and the conviction of an innocent person. The cause and prejudice requirements may be overlooked and habeas relief granted "[i]f a petitioner presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust v. Zent*, 17 F.3d 155, 162 (6th Cir. 1994) (citing *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). However, "[t]o be credible, such a

12

claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).

Petitioner has not supported his allegation of constitutional error with new and reliable evidence that was not presented at trial. Therefore, a miscarriage of justice will not occur as a result of the Court's failure to consider the substantive merits of his claim.

### 2. On the Merits

Even if Petitioner's claim were not procedurally defaulted, the prosecutor did not indicate a personal belief in Wilson's credibility based on special knowledge of facts not before the jury. She based her argument on actual testimony that Wilson informed the complainant that the men who supposedly assaulted her would return to the apartment where the assault occurred. (Tr. Jan. 24, 2006, at 65.) Because the prosecutor's disputed comment was based on the evidence adduced at trial and not on special knowledge of facts unknown to the jury, her comment did not fall under the rubric of improper vouching. *Davis*, 2009 WL 4795326, at *7.

Furthermore, although Petitioner claims that the prosecutor was inflating Wilson's credibility as a witness when she stated that Wilson was telling the truth, the prosecutor previously referred to Wilson as "a big, fat, slimy creep" because he denied hearing any noise, including the complainant's screams, when the incident occurred. (Tr. Jan. 26, 2006, at 98.) Coupled with her later statement that Wilson's denial was "a bunch of crap" (*id.* at 99), the prosecutor undermined Wilson's credibility to some extent and disparaged his character. The trial court, moreover, charged the jury not to view the lawyers' statements

13

as evidence and, instead, to glean the legal theories behind them. (Tr. Jan. 26, 2006, at 135). The Court therefore concludes that the alleged prosecutorial misconduct did not infect the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).

### D. Limitations Imposed on Cross-Examination of Detective Cerna

The fourth and final habeas claim alleges that Petitioner's rights to due process and to confront the witnesses against him were violated by the trial court's ruling that he could not ask Detective Santiago Cerna whether the police investigated or charged Pierre Wallace. (Tr. Jan. 25, 2006, at 81-86.) The Michigan Court of Appeals stated that the proffered evidence was not relevant and that the trial court did not abuse its discretion in precluding defense counsel from questioning Detective Cerna about Pierre Wallace's connection to the crime.

The right of cross-examination, while a fundamental one, is not without restriction, as trial judges have "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. VanArsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). "Where the trial court limits the extent of cross-examination, the inquiry for the reviewing court is 'whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory.'" *Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2006) (quoting *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989)).

14

Petitioner contends that the omitted testimony was relevant to showing that the police investigation was inadequate and that a more thorough investigation would have exonerated him.  The complainant, however, identified Petitioner in a photographic line-up shortly after the incident, and Petitioner conceded in an interview with the police that he had sex with the complainant.  The primary issue at trial was whether the sexual activity was consensual.  An investigation into Wallace's role in the assault on the complainant was not relevant to the determination of Petitioner's guilt or innocence.

Furthermore, despite the trial court's ruling, the defense attorneys managed to elicit testimony that the police interviewed Wallace, that he was free to leave after he gave a statement to the police, and that no further investigation of Wallace was conducted.  (Tr. Jan. 25, 2006, at 106 and 114; Tr. Jan. 26, 2006, at 33-34.)  Wallace himself testified at Petitioner's trial and supported Petitioner's claim that sex with the complainant was consensual.  The jury therefore had enough information to assess the defense theory.  In the words of the state court, Petitioner

> has failed to demonstrate how delving further into the police investigation of Wallace would disprove his own culpability.  As such, the inference [Petitioner] is trying to draw between the particulars of the police investigation of Wallace and his own culpability is tenuous and may have confused the issues.

*West*, 2007 WL 1491075, at *6 (citations omitted).  The limitations placed on Petitioner's cross-examination of Detective Cerna were not unfair and did not deprive Petitioner of his constitutional right of confrontation.

## IV. Conclusion

The state appellate court's conclusions did not lead to a decision that was an unreasonable determination of the facts, contrary to Supreme Court precedent, or an

unreasonable application of any Supreme Court decision. The petition for a writ of habeas corpus [Docket No. 1, filed June 17, 2008] therefore is **DENIED**.


## V. Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . . . When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000).

Reasonable jurists would not disagree with the Court's resolution of Petitioner's first, second, and fourth claims. Nor would reasonable jurists find it debatable whether the Court's procedural ruling on Petitioner's third claim is correct or whether the petition states a valid claim of the denial of a constitutional right. Accordingly, the Court declines to issue a certificate of appealability. Petitioner may proceed *in forma pauperis* on appeal without

further authorization because he was permitted to proceed *in forma pauperis* in the District

Court.  Fed. R. App. P. 24(a)(3).


                                        S/Denise Page Hood
                                        Denise Page Hood
                                        UNITED STATES DISTRICT JUDGE

Dated:  December 31, 2009

                          CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys
and/or parties of record by electronic means or U.S. Mail on December 31, 2009.


                                        S/Andrea Teets
                                        Deputy Clerk